IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY, KANSAS

| | | |
|---|---|---|
| SAMANTHA COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-02133-KHV-DJW |
| | ) | |
| OLATHE HEALTH SYSTEMS, INC., | ) | |
| MELISSA DAVENPORT, | ) | |
| LEE R. KIBBEE, | ) | |
| WESLEY H. SMITH, | ) | |
| THE CITY OF OLATHE, | ) | |
| DR. RONALD KARLIN, and | ) | |
| KIM WHEELER, | ) | |
| Defendants. | ) | |

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Defendants Lee Kibbee, Wesley Smith, and the City of Olathe, Kansas, seek summary

judgment on plaintiff's remaining claims.

## I.  INTRODUCTION

On April 17, 2008, Defendant Lee Kibbee, who is employed by the City of Olathe Police

Department, stopped the plaintiff for speeding on northbound I-35 in Olathe, Kansas.  Following his

initial contact with the plaintiff, Kibbee suspected that she was driving under the influence of

alcohol.  After asking the Plaintiff to step out of her car, Kibbee asked her if she had any drugs or

weapons on her and asked for her permission to search her, which she granted.  Kibbee directed the

plaintiff to perform standardized field sobriety tests, which the plaintiff failed.  Plaintiff was arrested

and placed in the rear of Kibbee's patrol car.

While the plaintiff was in the back of Kibbee's patrol car she became extremely agitated and

began to hyperventilate.  She was removed from the vehicle and placed on the shoulder where she

continued to hyperventilate.  At her request, the officers called Johnson County Med-Act and the Olathe Fire Department.

The plaintiff was screened by emergency medical technicians from Johnson County Med-Act who found a "strong alcohol" odor on her breath.  She was placed on an ambulance gurney and loaded into the ambulance to begin transport to Olathe Medical Center for a more thorough evaluation.  Pursuant to Department policy, Kibbee was required to accompany the plaintiff in the ambulance to the hospital.  Before the ambulance left the scene, the plaintiff became combative and was physically and verbally abusive to the officers and the EMTs.  This required Kibbee and Smith to restrain the plaintiff in order to avoid injury to herself or the EMTs.

Upon arrival at the Olathe Medical Center, the plaintiff was agitated, combative, hostile, inappropriate, uncooperative.  By her own admission she was "extremely aggressive."

Dr. Karlin attempted to perform a routine physical examination, but could not do so because of plaintiff's conduct.  Those portions of the examination that could be completed showed that she was tachychardic with increased respiration, and exhibit bazaar and irrational behavior.  Dr. Karlin did not believe that she could reasonably consent to her treatment and order blood and urine testing to determine whether she had ingested intoxicants.

The blood alcohol tests showed a blood alcohol level of nearly twice the legal limit (.153), and her urine test was "presumptive positive" for marijuana.  Over plaintiff's objection at a suppression hearing, this evidence was admitted at her criminal trial which resulted in her conviction on multiple counts.

## II.  ISSUES PRESENTED

A.    Kibbee did not violate Cook's constitutional rights in regard to the search of her person.

1.    The search was proper incident to arrest.

2.    Cook consented to the search.

B.     The officers did not violate Cook's constitutional rights in regard to the preservation and production of audio and video evidence of the arrest and post-arrest events.

C.     The officers did not violate Cook's constitutional rights in regard to collection of the blood and urine samples.

D.     The *Monell* claims against the City fail.

    1.     There was no constitutional violation.

    2.     No custom, practice or policy caused a constitutional injury.

E.     The failure to train claims against the City fail.

    1.     There is no constitutional violation.

    2.     The training was adequate.

    3.     There is no evidence of deliberate indifference.

    4.     Any deficiency did not cause a constitutional violation.

### III.  DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS

Defendants submit the following statement of facts for the purpose of testing the legal sufficiency of plaintiff's claims and evidence. Consistent with the requirements of a motion for summary judgment, the facts herein are based upon the evidence viewed in the light most favorable to plaintiff.  Defendants reserve the right to controvert these facts should a trial be necessary.

1.     Lee Kibbee is a police officer and employee of the City of Olathe. (Suppression Hearing Transcript, 6, attached as Exhibit 1)

2.     Wesley Smith is a police officer and employee of the City of Olathe. (Suppression Hearing Transcript, 27, attached as Exhibit 1)

3.     On April 17, 2008, Samantha Cook was driving northbound on I-35 when Kibbee stopped her for speeding. (*See,* Second Amended Complaint, Doc.#160, ¶13; *see also* In-Car Video, conventionally filed as part of Affidavit of Karri Barker Exh. A, Doc. #89)

4.      When Kibbee activated his lights and sirens, Cook continued driving in the center lane of the highway. (*See*, Cook Trial Transcript, Vol. 1, June 29, 2009, 63, attached in relevant part as Exhibit 2; *see also,* In-Car Video, conventionally filed as part of Affidavit of Karri Barker Exh. A, Doc. #89)

5.      Cook eventually moved to the right lane but still did not pull over. (*See,* Cook Trial Transcript, Vol. 1, June 29, 2009, 63, attached in relevant part as Exhibit 2; *see also,* In-Car Video, conventionally filed as part of Affidavit of Karri Barker Exh. A, Doc. #89)

6.      Cook swerved to the left and then began moving to the right shoulder of the highway where she stopped. (*See,* Cook Trial Transcript, Vol. 1, June 29, 2009, 63, attached in relevant part as Exhibit 2; *see also* In-Car Video, conventionally filed as part of Affidavit of Karri Barker Exh. A, Doc. #89)

7.      Kibbee approached Cook's vehicle and asked for her license. (*See,* Cook's Incident Report, Officer Narrative, page 3, attached as Exhibit 3; *see also,* In-Car Video, conventionally filed as part of Affidavit of Karri Barker Exh. A, Doc. #89)

8.      Kibbee observed that Cook's speech was thick and slurred; her eyes were bloodshot and she emitted a strong odor of alcoholic beverage. (*See,* Cook's Incident Report, Officer Narrative, page 3, attached as Exhibit 3; *see also,* Cook Trial Transcript, Vol. 1, June 29, 2009, 70, attached in relevant part as Exhibit 2)

9.      Kibbee suspected Cook was driving under the influence of alcohol and/or drugs in violation of K.SA. 8-1567. (Suppression Hearing Transcript, 7, attached as Exhibit 1)

10.     Smith arrived at the scene of the stop to assist Kibbee. (Cook Trial Transcript, Vol. 2, June 30, 2009, 101, attached in relevant part as Exhibit 4)

11.     Kibbee asked Cook to exit the vehicle. (Cook's Incident Report, Officer Narrative, page 3, attached in relevant part as Exhibit 3)

12.     Kibbee asked Cook for her consent to search her person for drugs and weapons, and she agreed. (*See,* Cook's Incident Report, Officer Narrative, page 3, attached as Exhibit 3; *see also,* Cook Trial Transcript, Vol. 2, June 30, 2009, 33-34, as Exhibit 4; In-Car Video, conventionally filed as part of Affidavit of Karri Barker Exh. A, Doc. #89, at time stamp 4:15)

13.     At trial, Cook did not deny that she provided consent for the search. (Cook Trial Transcript, Vol. 3, July 1, 2009, 48:15-17, attached in relevant part as Exhibit 5)

14.     Plaintiff admits that while working as a female entertainer at a gentleman's club on the evening of April 16-17, 2008, she consumed alcoholic beverages, prior to being pulled over by Officer Kibbee.  In addition, plaintiff believes another person spilled alcohol on her clothing that night.  (Deposition of Samantha L. Cook, attached in relevant part as Exhibit 6, at p. 150:15-24, 163:22-164:3).

15.     Kibbee did not perform a pat down, but performed a full search of Cook's person for drugs and weapons. (Cook Trial Transcript, Vol. 2, June 30, 2009, 33-34, attached in relevant part as Exhibit 4)

16.     Cook was cooperative. She did not ask for a female officer to perform the search. (Cook Trial Transcript, Vol. 3, July 1, 2009, 77:19-22, attached in relevant part as Exhibit 5)

17.     Cook performed field sobriety tests at Kibbee's request. (*See,* Cook's Incident Report, Officer Narrative, page 3, attached in relevant part as Exhibit 3; *see also,* Cook Trial Transcript, Vol. 2, June 30, 2009, 25-33, attached in relevant part as Exhibit 4).

18.     Cook did not successfully complete the tests. (Cook Trial Transcript, Vol. 1, June 29, 2009, 70-75, attached in relevant part as Exhibit 2)

19.     While Cook was performing the field sobriety tests, Smith observed a marijuana pipe on the floorboard of Cook's car. (Cook Trial Transcript, Vol. 2, June 30, 2009, 103-04, attached in relevant part as Exhibit 4)

20.     Smith told Kibbee that he had seen the pipe in Cook's car. (Cook Trial Transcript, Vol. 2, June 30, 2009, 34-35, attached in relevant part as Exhibit 4)

21.     Kibbee placed Cook under arrest. (*See,* Second Amended Complaint, Doc.#160, ¶20; *see also* Suppression Hearing Transcript, 7, attached as Exhibit 1)

22.     Cook was handcuffed and placed in the back seat of the patrol car. (Second Amended Complaint, Doc.# 160, ¶20; *see also* Suppression Hearing Transcript, 7, attached as Exhibit 1)

23.     The back seat was separated from the front seat by a small plexiglass enclosure. (Amended Complaint, Doc.#160, ¶20)

24.     Kibbee searched Cook's car following her arrest and found the pipe with burnt marijuana inside. (Cook Trial Transcript, Vol. 2, June 30, 2009, 35, attached in relevant part as Exhibit 4)

25.     Cook began to hyperventilate in the back seat of the patrol car. (Second Amended Complaint, Doc.#160, ¶24)

26.     Cook was screaming, yelling, kicking, biting and spitting. (Suppression Hearing Transcript, 9, attached as Exhibit 1)

27.     Cook asked for an ambulance and the officers called one for her. (Suppression Hearing Transcript, 8, attached as Exhibit 1)

28.     Cook was allowed to get out of the car and wait at the side of the road. (Suppression Hearing Transcript, 17, attached as Exhibit 1)

29.     When the ambulance arrived Cook asked to be taken to the hospital. (Suppression Hearing, 8-10, attached as Exhibit 1)

30.     Kibbee and Smith rode with Cook in the ambulance. (Second Amended Complaint, Doc.#160, ¶32)

31.     Once in the ambulance, Cook tried to kick a paramedic. (Suppression Hearing Transcript, 10, attached as Exhibit 1)

32.     Cook was screaming, kicking and spitting in the ambulance. (Suppression Hearing Transcript, 29, attached as Exhibit 1)

33.     Kibbee and Smith physically restrained Cook to prevent injury to herself, paramedics and the officers. (Suppression Hearing Transcript, 10, 29-30, attached as Exhibit 1)

34.     The ambulance ride lasted approximately 15 minutes. (Suppression Hearing Transcript, 11, attached as Exhibit 1)

35.     Upon arrival at the emergency room of Olathe Medical Center ("OMC"), Cook continued to scream and kick. (Suppression Hearing Transcript, 11-12, 38, attached as Exhibit 1)

36.     Upon arrival at Olathe Medical Center, Ms. Cook was tachycardic, with an elevated pulse of 121 beats per minute and an increased respiratory rate of 100 breaths per minute.  (*See*, ECC Triage Form, attached as Exhibit 7, *see also*, Deposition of Ronald J. Karlin, M.D., attached in relevant part as Exhibit 8, at p. 94:9-95:2; 96:17-97:21).

37.     Cook admitted that her behavior in the emergency room was extremely aggressive. (Deposition of Samantha L. Cook , attached in relevant part as Exhibit 6 at pp: 258:1-15, 270:5-7, 329:2-9)

38.     Kibbee believed at that point that Cook was a threat to herself and all others present. (Suppression Hearing Transcript, 13, attached as Exhibit 1)

39.     The nurses at the hospital removed Cook's clothes and put her in a hospital gown. (Suppression Hearing Transcript, 21-22, attached as Exhibit 1)

40.     Kibbee and Smith were present when this occurred. (Suppression Hearing Transcript, 26-27, 35-36, attached as Exhibit 1)

41.     Smith was holding her left arm but turned away, "doing as much as [he] could not to look." (Suppression Hearing Transcript, 35-36, attached as Exhibit 1)

42.     Dr. Ronald Karlin examined Cook. (Suppression Hearing Transcript, 41, attached as Exhibit 1)

43.     Dr. Karlin ordered blood and urine samples to be taken from Cook to determine whether and what lifesaving medical treatment was needed and to provide medical clearance due to her custody status. (*See* Answers to Plaintiff's First Interrogatories to Dr. Ronald Karlin, ¶1 attached as Exhibit 9; *see also,* Suppression Hearing Transcript, 41-42, attached as Exhibit 1; *see also,* Deposition of Dr. Ronald J. Karlin, attached in relevant part as Exhibit 8 at pp. 17:8-14, 24:16-22)

44.     Dr. Karlin ordered a variety of diagnostic tests for Cook, including glucose testing to check blood sugar levels, BUN and creatine testing to test kidney function, as well as testing to assess her carbon monoxide, potassium, sodium and chloride levels. He also ordered a test on Cook's arterial blood gasses, as well as a drug panel, aspirin, acetometaphen and alcohol testing. (Emergency Care Physician's Order Sheet, attached as Exhibit 10)

45.     Dr. Karlin routinely orders diagnostic blood and urine testing on emergency room patients. He said he orders these tests for 95 percent of the emergency room patients he evaluates. (Deposition of Dr. Ronald J. Karlin, attached in relevant part as Exhibit 8 at pp. 24:23 to 25:11)

46.     Dr. Karlin did not believe Ms. Cook was capable of giving consent at the time he ordered these diagnostic tests. *See*, Exhibit 9, at ¶1).

47.     Dr. Karlin also ordered that Cook be secured to the bed with hospital restraints. (Suppression Hearing Transcript, 47, attached as Exhibit 1)

48.     Kibbee did not at any time direct any of the medical staff to draw blood or take urine from Cook. (Suppression Hearing Transcript, 13, attached as Exhibit 1)

49.     Smith did not at any time direct any of the medical staff to draw blood or take urine from Cook. (*See* Exhibit 1, p. 30)

50.     While at OMC Kibbee provided Cook with oral and written notice of implied consent and asked her if she would provide a blood sample. (*See* Exhibit 3, p. 4)

51.     Nurse Melissa Davenport Smith testified she was in Ms. Cook's hospital room the entire time she was in the emergency room.  There is no evidence Officer Kibbee or Officer Smith ordered the OMC Defendants to take a blood draw or urine sample.  Instead, Ms. Davenport Smith corroborated the blood and urine testing was performed pursuant to the patient orders from Dr. Karlin.  (*See* Exhibit 1, at p. 41:21-43:19).

52.     OMC employees drew blood from Cook. (Second Amended Complaint, Doc.# 160, ¶48)

53.     Neither Kibbee nor Smith inserted the needle to draw blood. (Plaintiff's Response to City's First Request for Admissions, attached as Exhibit 11, at ¶13-14)

54.     Cook admitted at her criminal trial that the officers were holding her still so the nurses could draw blood. (Cook Trial Transcript, Vol. 3, July 1, 2009, attached in relevant part as Exhibit 5 at p. 60)

55.     OMC employees drew urine from Cook using a catheter they inserted. (Second Amended Complaint, Doc.# 160, ¶51)

56.     Neither Kibbee nor Smith inserted the catheter to draw urine. (*See* Exhibit 11, at ¶15-16)

57.     Kibbee and Smith held Cook down while the nurse inserted the catheter. (*See* Second Amended Complaint, Doc.#160, ¶51; *see also,* Exhibit 1, p. 19-22, 31)

58.     They were holding her legs so the nurse inserting the catheter would not get kicked. (*See* Exhibit 1, p. 58)

59.     Nurse Melissa Davenport testified that Cook was able to move her legs during the procedure. "The other two nurses were at the head of the bed with her. I was doing the catheter, and we asked officers to be in there so that I wouldn't get injured in case she would want to act out." (*See*, Exhibit 1, p. 59)

60.     Ms. Cook's blood test demonstrated her blood alcohol content was 0.153, nearly double the legal driving limit of 0.08.  (*See*, Diagnostic Testing Results, attached as Exhibit 12, at p. 2, "Chemistry.")  Ms. Cook does not dispute these findings.  (Exhibit 6, Cook Depo., at p. 325:24-326:2)

61.     Ms. Cook's urine tested "presumptive positive" for marijuana, though she was not charged with any crime related to this test.   (Exhibit 6, Cook Depo., at p. 209:7-9; *see also*, Exhibit 12, Diagnostic Testing Results, at p. 5, "UA/Urine Chemistry.")

62.     Cook was charged with a variety of crimes in Johnson County District Court Case No. 08-CR 880, including: refusing a preliminary breath test, possession of drug paraphernalia, driving under the influence, battery, and battery on a law enforcement officer. (Plaintiff's Response to City's First Request for Admissions, attached as Exhibit 11 at  ¶3-7)

63.     During Cook's criminal trial, Smith testified that Cook battered him, causing visible injuries. (Cook Trial Transcript, Vol. 2, June 30, 2009, attached in relevant part as Exhibit 4 at pp. 111-12)

64.     During Cook's criminal trial, Kibbee testified that Cook battered him, causing visible injuries. (Cook Trial Transcript, Vol. 1, June 29, 2009, attached in relevant part as Exhibit 2 at p. 86)

65.     Cook testified that her acts of physical battery upon Kibbee and Smith were done in self-defense. (Cook Trial Transcript, Vol. 3, July 1, 2009, attached in relevant part as Exhibit 5 at p. 84)

66.     During Cook's criminal trial, Dr. Karlin testified that he ordered a blood test for Cook and the test showed that her blood alcohol content immediately following her arrest was .153, nearly double the legal limit of .08. (Cook Trial Transcript, Vol. 1, June 29, 2009, attached in relevant part as Exhibit 2 at pp. 48-49)

67.     Cook was convicted by a jury on all charges. (*See*, Plaintiff's Response to City's First Request for Admissions, attached as Exhibit 11 at ¶8-12; *see also,* Cook Verdict Transcript, July 2, 2009, attached in relevant part as Exhibit 13)

68.     Cook did not appeal her convictions.  (Plaintiff's Response to City's First Request for Admissions, attached as Exhibit 11 at ¶19)

69.     Cook filed a notice of claim with the City of Olathe in a letter dated April 17, 2009. (Notice of Claim attached as Exhibit 14)

70.     Cook filed the instant action on March 8, 2010. She asserted claims against Kibbee, Smith, the City of Olathe Police Department and others for batter, intentional or negligent infliction of emotional distress, negligence and violation of constitutional rights. (Doc.#1)

71.     On March 22, 2010, Cook filed an amended complaint. (Doc.#3)

72.     Cook filed a motion for partial summary judgment on her claims against Kibbee and Smith. (Doc.# 53) It was denied. (Doc.# 185)

73.     Cook was granted leave to file a Second Amended Complaint (Doc.# 158) and she filed it on January 7, 2011. As part of her Second Amended Complaint she substituted the City of Olathe for the Olathe Police Department. (Doc.# 160)

74.     Kibbee, Smith and the City filed a motion for summary judgment. (Doc.# 77)

75.     The motion was granted in part. This Court dismissed the state claims against Kibbee and Smith and some of the federal claims. (Doc.#185)

76.     Plaintiff was asked during discovery in the instant case to state the material facts known to her which support her claim that she was deprived of constitutional rights due to inadequate training or supervision, or other custom, policy, practice or authorization by the City of Olathe. (Plaintiff's Second Supplemental Responses to Defendant City of Olathe Police Department's First Set of Interrogatories to Plaintiff attached as Exhibit 15)

77.     Plaintiff did not indicate any specific material facts supporting her claim in her initial response or her supplemental response. (Plaintiff's Second Supplemental Responses to Defendant City of Olathe Police Department's First Set of Interrogatories to Plaintiff attached as  Exhibit 15)

78.     The Olathe Police Department has a policy, Policy Directive 6.15, entitled "Use of Recording and Tracking Equipment." (*See* Deposition of Greg O'Halloran, attached in relevant part as Exhibit 16 at pp 10:19 to 11:2; *see also,* O'Halloran Deposition Exhibit 1 attached as Exhibit 17)

79.     The policy was in force on April 17, 2008. (Deposition of Greg O'Halloran, attached in relevant part as Exhibit 16 at pp. 10:25 to 11:2)

80.     The policy contains guidelines for the use, management, storage, and retrieval of Mobile Video Recording ("MVR") equipment and voice recorders used by members of the Olathe Police Department. (*See* Deposition of Greg O'Halloran, attached in relevant part as Exhibit 16 at p. 11:3-11; *see also,* O'Halloran Deposition Exhibit 1, attached as Exhibit 17 at page 1)

81.     There are three types of MVR equipment, or in-car recorders, depending on the age of the patrol car: VHS, DVD or digital recording. (Deposition of Greg O'Halloran, attached in relevant part as Exhibit 16 at p. 36:6-13)

82.     Officers are trained in the use of the audio recorders through the Field Training Officer program, one of the first phases of training for new officers. (Deposition of Greg O'Halloran, attached in relevant part as Exhibit 16 at pp. 12:21 to 13:6)

83.     Officers are trained on how to work the recorder and how to store the recordings. (Deposition of Greg O'Halloran, attached in relevant part as Exhibit 16 at p. 13:8-10)

84.     Department policy states that audio recorders should be used by all uniformed officers during domestic violence investigations, traffic stops, citizen statements made during an investigation, interviews with suspects or arrestees, problems at the detention facility, or if there is an expectation of a need to respond to active aggression or resistance. (*See,* Deposition of Greg O'Halloran, attached in relevant part as Exhibit 16 at p. 13:16-21; O'Halloran Deposition Exhibit 1, page 6, attached as Exhibit 17)

85.     Department policy states that video recorders should be used during traffic stops. (O'Halloran Deposition Exhibit 1, attached as Exhibit 17, § III(F)(1)).

86.     Department policy gives officers discretion to turn off the audio or video recorder in certain circumstances, including during direct officer to officer consultations away from contact with the public; where proper investigative techniques require it; and where the physical activation of the equipment would interfere with officer safety techniques. (Deposition of Greg O'Halloran, attached in relevant part as Exhibit 16 at pp. 14:2-12,  20:21-24; O'Halloran Deposition Exhibit 1, page 2-3, attached as Exhibit 17)

87.     Department policy does not state that the audio or video recorder should or must be activated while asking someone to take a breath test or when reading an implied consent advisory. (Deposition of Greg O'Halloran, attached in relevant part as Exhibit 16 at pp. 15:23 to 16:12)

88.     Department policy includes requirements for officer creation of logs to note information about incidents recorded, storage of logs, storage of tapes and other media, and anti-erasure protections. ( O'Halloran Deposition Exhibit 1, attached as Exhibit 17, § III(D), (H), (J), (K), (M), (N), § IV, V, and VII)

89.     Department policy states that recorded media are either: 1) placed into evidence; or 2) otherwise placed in storage to be held for 90 days before being destroyed. An officer may use the Check Out/Hold Log procedure to remove recorded media from the 90-day schedule for use in a court case or for training or other purposes. ( O'Halloran Deposition Exhibit 1, attached as Exhibit 17 §IV(B) and (F), V(B) and (F))

90.     No recorded media may be erased without prior approval of the Division Commander. ( O'Halloran Deposition Exhibit 1, attached as Exhibit 17, § IV(G), V(H))

91.     Kibbee and Smith have completed the prescribed training at regional academies necessary to qualify as a certified Law Enforcement Officer in the State of Kansas. (O'Halloran Affidavit, attached as Exhibit 18, at ¶ 3)

92.     Since their initial qualification, both officers have completed the Olathe Police Department Field Training Curriculum and have maintained on an annual basis the necessary training hours to maintain their certification as a law enforcement officer. (O'Halloran Affidavit, attached as Exhibit 18, at ¶3)

93.     As part of this training, Kibbee and Smith received training on the policies of the Olathe Police Department as it pertains to arrest, search and seizure to include the Policy Directives and Protocol in effect at the time. (O'Halloran Affidavit, attached as Exhibit 18 at ¶4)

94.     Policy Directive 2.2, in effect at the time of Plaintiff's arrest, speaks to the issue of when an officer is required to transport a person in custody to a medical facility.  The Policy Directive states in pertinent part at Subsection XII:

* * *

> "B.     If a person receiving medical attention is transported to a medical facility, an officer shall accompany the person and should remain with the person until such time as the person is released from police custody or is released to another agency."

(O'Halloran Affidavit, attached as Exhibit 18, at ¶5)

95.     Officers are required to use their judgment while a person is in custody and receiving medical attention to make certain that the person is not a flight risk or poses a safety threat to himself/herself, medical personnel, or an officer. (O'Halloran Affidavit, attached as Exhibit 18, at ¶6)

96.     Although there was no written policy in effect at the time of Cook's arrest, the Olathe Police Department had in place an Officer Handbook which contained within it protocol for blood draws for DUIs. (O'Halloran Affidavit, attached as Exhibit 18, at ¶7)

97.     Policy Directive 2.1, in effect at the time of Cook's arrest, speaks to the issue of when an officer may conduct an arrest, search and seizure. (O'Halloran Affidavit, attached as Exhibit 18, at ¶8)

## IV.  ARGUMENTS AND AUTHORITIES

### A.     Standard of review.

In determining a motion for summary judgment, the court must decide whether there is a genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way and is 'material' when it is essential to the proper disposition of the claim."  *Ripley v. Wyoming Medical Ctr., Inc.*, 559 F.3d 1119, 1121 (10th Cir. 2009) (citations omitted).

### B.     Qualified immunity.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The protection of qualified immunity applies regardless of whether the government official's error

is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567 (2004).

Qualified immunity is "an immunity from suit rather than a mere defense to liability," and it is "lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine of qualified immunity doctrine was created to ensure that insubstantial claims against government officials will be resolved prior to burdensome discovery. *Anderson v. Creighton*, 483 U.S. 635, 640, n. 2 (1987). The courts have thus "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff, who must clear two hurdles to defeat the defendant's motion. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). Plaintiff must demonstrate, on the facts alleged, that: (1) defendant violated a constitutional right; and (2) the right was clearly established at the time of the alleged unlawful activity. Id. The court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

"A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right." *Swanson v. Town of Mountain View*, 577 F.3d 1196, 1200 (10th Cir. 2009). A "plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it." *Id.* "In order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999).

## C.   First Summary Judgment Order.

In its order on defendants' motion for cross-summary judgment [Doc.#185], this Court denied defendants' motion for summary judgment on the issue of whether Kibbee and Smith used excessive force on Cook while restraining her in the ambulance.   Defendants respectfully disagree and preserve the issue for appeal should appeal ultimately become necessary. The issue will not be re-briefed here.

In the same order [Doc. #185], this Court concluded that defendants were entitled to summary judgment on the following issues: 1) Kibbee and Smith did not use excessive force on Cook while restraining her at the hospital; 2) Cook's state law battery claim was time-barred; 3) Kibbee and Smith did not perform an unconstitutional strip search of Cook; and 4) defendants did not violate Cook's right to privacy or other patient rights, if any. This Court also held that, to the extent Kibbee and Smith did not commit constitutional violations in regard to these claims, the City could not be held liable. Because defendants prevailed on these issues, they will not be re-briefed here.

### 1.   Kibbee did not violate Cook's constitutional rights in regard to the search of her person.

Cook claims that Kibbee performed an "overly intrusive search for weapons" after he stopped Cook in that he allegedly put his hands in Cook's pants pockets. The search was conducted incident to arrest and with Cook's consent. There was no constitutional violation.

#### a.   The search was proper incident to arrest.

Under the Fourth Amendment, warrantless searches are per se unreasonable, subject to a few exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). One of the exceptions to the warrant requirement is a search incident to a lawful arrest.  *Weeks v. United States*, 232 U.S. 383, 392 (1914). The exception arises from the need for officer safety and preserving evidence. *United States v. Robinson*, 414 U.S. 218, 230-234 (1973). A search incident to arrest may include "the arrestee's

person and the area 'within his immediate control'- construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969). This includes the pockets of clothing on the person searched. *U.S. v. Gay*, 774 F.2d 368 (10th Cir. 1985) (search of pockets of apparently intoxicated person prior to arrest upheld as permissible search incident to arrest).

A search incident to arrest need not take place after the arrest.  A warrantless search preceding an arrest is a proper search incident to arrest if: (1) there was a legitimate basis for the arrest before the search, and (2) the arrest followed shortly after the search. *U.S. v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998). "Whether or not the officer intended to actually arrest the defendant at the time of the search is immaterial to this two-part inquiry." *Id.*

Here, Kibbee observed Cook speeding. She drove erratically when he attempted to pull her over. When Kibbee approached Cook's vehicle, he observed that Cook's speech was thick and slurred; her eyes were bloodshot and she emitted a strong odor of alcoholic beverage. She had some difficulty trying to produce a driver's license.  He believed Cook was driving under the influence of alcohol and/or drugs.  Kibbee had a legitimate basis to arrest Cook for driving under the influence.

A search may be considered incident to an arrest where the search and arrest were separated by times ranging from five to sixty minutes.  *See U.S. v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006).  Here, Kibbee performed the search. He then asked Cook to complete field sobriety tests, which she failed.  Kibbee placed Cook under arrest. The search and formal arrest were separated by minutes.

The search was proper incident to arrest. There was no constitutional violation.

> ### b.    Cook consented to the search.

Warrantless searches are permitted where the person to be searched consents. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The voluntariness of consent is determined by the totality

of the circumstances. *U.S. v. Silva-Arzeta*, 602 F.3d 1208, 1213 (10th Cir. 2010). The videotape reveals that Kibbee asked Cook if she had any drugs or weapons and asked permission to search her. She consented. This matches Kibbee's testimony at trial. Even Cook did not deny at trial that she consented to the search.

Because Cook voluntarily consented to the search, there was no constitutional violation.

> **2.     The officers did not violate Cook's constitutional rights in regard to the preservation and production of audio and video evidence of the arrest and post-arrest events.**

Plaintiff claims that Kibbee and Smith violated her Fourth, Fifth, Sixth, and Fourteenth Amendment rights when they failed to preserve and/or produce exculpatory or potentially exculpatory audio and video evidence. [Draft Pretrial Order, Plaintiff's Theories of Recovery, §6(a)(3)][1] This claim is not raised in Cook's Second Amended Complaint [Doc.#160]. It cannot be raised or considered at this late date.

Cook complains because Kibbee and Smith either: 1) did not audio and/or video record the entirety of her arrest, ambulance ride, and treatment at the hospital, and/or 2) they destroyed parts of the recordings after the fact.

The failure to preserve potentially exculpatory evidence is generally analyzed under the due process clause of the Fifth and Fourteenth Amendments. In order for a court to find a deprivation of due process, the evidence must both "possess an exculpatory value that was apparent before the evidence was destroyed" and also "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). In matters involving "potentially exculpatory" evidence, a criminal defendant must

---

[1]As of the date of this filing, no final Pretrial Order has been entered in this case.  Defendants object to Cook's attempt to insert these claims into the Pretrial Order because they were not included in her Second Amended Complaint.

"show bad faith on the part of the police" in order to show a denial of due process.  *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

Further, plaintiff cannot establish a due process claim in these circumstances without showing that the defendants' failure to preserve evidence resulted in a fundamentally unfair criminal conviction.  *See George v. City of Wichita, Kan.*, 348 F.Supp.2d 1232, 1242 (D.Kan. 2004); *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999). Cook makes no such allegation here, nor does she have evidence to support it.

In regard to Cook's claim that portions of the audio and video tapes were destroyed after the fact, Cook does not specify what portion of the audio or video tapes were destroyed, when, or by whom. She does not specify the contents of the alleged missing portions. She does not specify whether there were witnesses to these conversations who might testify at trial as to their contents. Clearly, there were witnesses to her arrest, ambulance ride, and treatment in the hospital, thus there is no lack of evidence about what went on during the alleged "missing" portions of the tapes.

Even if she could prove missing portions of the tapes were potentially exculpatory, she cannot point to any evidence of bad faith on the part of Kibbee, Smith or anyone else employed by the City of Olathe. There is no evidence that portions of the tapes were erased or destroyed at all, let alone in bad faith. Her due process claim fails.  *See, Crosby v. Watkins*, 599 F.Supp.2d 1257, 1262 (D.Colo. 2009) (police failure to preserve audio tapes of interview with defendant and victim not a violation of due process rights because there was no showing of bad faith).

Some distinction has been recognized between the failure to record or otherwise memorialize an interview or other evidence in the first place and failing to preserve a recording already made. In *Bullock v. Carver*, 297 F.3d 1036, 1056-57, n. 8 (10th Cir. 2002), the Tenth Circuit recognized that it is not clear whether *Youngblood* applies "where a police officer fails to take notes or record

an interview in the first instance." The Bullock court assumed without deciding that it would apply *Youngblood* to the claims before it, and those claims failed.

The First Circuit faced a similar argument in *United States v. Brimage*, 115 F.3d 73, 76 (1st Cir. 1997). There, the criminal defendant claimed the government violated his due process rights by failing to "create" evidence by recording some, but not all, of its conversations with him. The court refused to impose a duty to record all contacts between the government and a suspect. It found no due process violation because there were witnesses who could testify to the conversations at issue and there was no evidence of bad faith by the government in "selective recording" of events. *Id.* at 77. *See also, U.S. v. Chaudhry*, 850 F.2d 851, 857 (1st Cir. 1988) (rejecting due process claim based on selective recording).

There is no constitutional right to have every moment of an encounter with police memorialized on tape. Indeed, "selective recording without more does not offend the Constitution." *U.S. v. Andreas*, 216 F.3d 645, 658 (7th Cir. 2000). As described above, Cook does not explain the exculpatory nature of the events allegedly not recorded, there are multiple witnesses to these events, and she has no evidence of bad faith on the part of Kibbee or Smith in their actions in turning on and off the audio and video recorders. The due process claim fails.

### 3. The officers did not violate Cook's constitutional rights in regard to collection of the blood and urine samples.

Blood and urine tests constitute searches under the Fourth Amendment. *Schmerber v. Calif.*, 384 U.S. 757, 767 (1966); *Sanders v. Thomas*, 167 Fed.Appx. 723, 724-25 (10th Cir. 2006). Warrantless compulsory blood or urine tests are unreasonable unless supported by both probable cause and exigent circumstances. *Marshall v. Columbia Lea Regional Hosp.*, 474 F.3d 733, 741 (10th Cir. 2007). To determine whether such tests violate the Fourth Amendment, the issues are: 1) whether police were justified in requiring the test; and 2) whether police used reasonable means and procedures in taking the sample. *Schmerber*, 384 U.S. at 768.

First, defendants repeat their argument that Kibbee and Smith did not require the tests – Dr. Karlin ordered the tests. Kibbee did nothing but take a portion of the sample already collected by Dr. Karlin. This argument is set forth at length in Defendants' Response to Plaintiff's Motion for Summary Judgment [Doc.#76], Section III, pages 21-25; and in Defendants' Cross-Motion for Summary Judgment [Doc.#78], Section III, pages 14-19. It is incorporated here by reference. This Court concluded in its prior order [Doc.#185, pages 18, 32] that there is a fact dispute about whether Kibbee and Smith, by restraining Cook during the procedures, caused them to occur. Defendants respectfully disagree and preserve the issue for appeal should appeal become necessary.

Turning to the *Schmerber* analysis, the officers had probable cause to arrest Cook for driving under the influence, among other crimes. Further, there were exigent circumstances. The only option left to the officers to collect evidence of Cook's crime was to obtain a blood or urine sample. As the Court recognized in *Schmerber*, "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." 384 U.S. at 770. Because the percentage of alcohol in a person's blood diminishes quickly, "there was no time to seek out a magistrate and secure a warrant" before the blood alcohol level dropped. 384 U.S. at 770-71. Because the "delay necessary to obtain a warrant ... threatened the destruction of the evidence," the Court upheld the warrantless seizure of blood. *Id.*

Besides the fact that the officers were justified in taking samples from the tests ordered by Dr. Karlin, the officers used reasonable procedures to obtain the samples. Neither Kibbee or Smith ordered the tests. They did not order that the samples be collected against Cook's wishes. They simply restrained her while nurses obtained samples ordered by Dr. Karlin. Once the samples were collected, Kibbee obtained portions from Dr. Karlin's samples for law enforcement use. Cook was not required to provide a second set of samples. Kibbee used reasonable means to obtain the blood and urine samples. Cook's claims to the contrary fail.

**4.      The *Monell* claims against the City fail.**

A local unit of government cannot be liable under Section 1983 unless it or a government employee commits an unconstitutional act which executes the government's custom, policy or practice. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). Liability may not be based on either a respondeat superior or vicarious liability theory. *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996). Rather, to establish liability against a governmental entity, plaintiffs must prove: 1) the existence of a governmental policy or custom, and 2) a direct causal link between the policy or custom and the injury alleged. *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993). This means that the municipal policy or custom must be the "moving force" behind the constitutional deprivation. *Myers v. Okla. County Bd. of County Com'rs*, 151 F.3d 1313, 1318 (10th Cir.1998).

**a.      There was no constitutional violation.**

Where individual defendants committed no constitutional violation, there is no government liability. *Butler v. City of Prairie Village, Kansas*, 172 F.3d 736, 747 (10th Cir. 1999) ("Because our conclusion that the individual defendants are entitled to qualified immunity rests on the determination that none of them violated Plaintiff's constitutional rights, the City may not be found to have violated his rights."). *See also, Wilson*, 98 F.3d at 1255 ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers.") The City is not liable here because Cook suffered no constitutional violation.

**b.      No custom, practice or policy caused a constitutional injury.**

Even if Cook could establish a constitutional violation, she has no evidence that a custom, practice or policy of the City caused a constitutional injury. An injury results from a municipal "policy" if it results "from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of County Comm'rs of Bryan*

*County v. Brown*, 520 U.S. 397, 403-404 (1997) (citing *Monell*, 436 U.S. at 694).  "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  *Id.* at 404  (citing *Monell*, 436 U.S. at 690-91).

Cook points to the following customs, practices or policies as causes of her injuries: 1) permitting police officers to decide what audio and video evidence to preserve and produce in criminal cases; 2) permitting police officers to remain in hospital rooms with arrestees; and 3) permitting police officers to participate in medical procedures. [Pretrial Order, Plaintiff's Theories of Recovery, §6(a)(7)(a)-(c)]

### (1)      Audio/video evidence.

First, there is no evidence that the City has a policy allowing officers to decide what audio and video evidence to preserve and produce in criminal cases. The Olathe Police Department has a policy, Policy Directive 6.15, entitled "Use of Recording and Tracking Equipment." It contains guidelines for the use, management, storage, and retrieval of Mobile Video Recording ("MVR") equipment and voice recorders used by members of the Olathe Police Department. Department policy states that audio recorders should be used by all uniformed officers during traffic stops and other encounters. Department policy gives officers discretion to turn off the audio or video recorder in certain circumstances, including during direct officer to officer consultations away from contact with the public; where proper investigative techniques require it; and where the physical activation of the equipment would interfere with officer safety techniques. There are detailed guidelines about logging and storing the recorded media. The tapes shall not be erased without prior approval of the Division Commander.

In sum, there is nothing in the policy which allows officers to decide what is preserved or produced. Second, there is no evidence that this policy caused Cook's alleged injuries in this case.

As set out above, there is no constitutional right to have police record every moment of a citizen encounter. As it is, most of relevant portions of the encounter were recorded. There is no municipal liability here.

**(2)    Hospital rooms.**

First, there is no OPD policy specifically addressing the presence of police officers in hospital rooms. There is a policy addressing the conduct of officers during and after arrest. OPD Policy Directive 2.1 §IV(I) makes clear that following an arrest, the officer is legally responsible for the safety of the arrestee. This requires that officers shall take reasonable steps necessary to protect: 1) the officer from the arrestee; 2) victims and third persons from arrestee; and 3) the arrestee from self-injury. Further, the policy states that officers shall not allow the arrestee out of their immediate presence for any reason. This includes a hospital room.

Further, Policy Directive 2.2 requires that if a person receiving medical attention is transported to a medical facility, an officer shall accompany the person and should remain with the person until such time as the person is released from police custody or is released to another agency. Officers are required to use their judgment while a person is in custody and receiving medical attention to make certain that the person is not a flight risk or poses a safety threat to himself/herself, medical personnel, or an officer.

Cook complains that this policy caused her injury because it allowed two male police officers to remain with her during treatment while she was, at times, partially dressed. As this Court observed in its earlier order on summary judgment, Cook has no evidence that either Kibbee or Smith viewed her while she was undressed. Hospital nurses exchanged Cook's clothing for a hospital gown. Smith testified that he held her left arm but turned away, trying not to look. [Doc.#185, page 26] Because she was under arrest, they were obligated to remain with her at all times. There is no municipal liability here.

(3)     **Medical procedures.**

There is no evidence that the City has a custom, policy or practice of allowing police officers to participate in medical procedures. There is no evidence that Kibbee or Smith participated in a medical procedure in this case. They simply restrained Cook while nurses drew blood and urine. The officers and the nurses testified that they did this for the safety of Cook and the nurses who were working with her. Cook's claims in this regard are without merit.

The Monell claims against the City are ill-defined by Cook, and in any event, they fail.

**5.     The failure to train claims against the City fail.**

Absent an explicit policy or an entrenched custom, the inadequacy of police training may be a basis to impose municipal liability. *Newell v. City of Salina*, 276 F.Supp.2d 1148, 1156 (D.Kan.2003).  "Where a superior's failure to train amounts to deliberate indifference to the rights of persons with whom his subordinates come into contact, the inadequacy of training may serve as the basis for §1983 liability." *Currier v. Doran*, 242 F.3d at 923. Plaintiff must go beyond allegations that officer training is merely deficient. " A supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Meade v. Grubbs*,  841 F.2d 1512, 1528 (10th Cir.1988). Plaintiff must "go beyond mere allegations that officer training is deficient" to properly establish a claim for negligent training. *Newell*, 276 F.Supp.2d at 1158 (citing, *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir.1988)).

**a.     There is no constitutional violation.**

In the instant case, plaintiffs have failed to establish an underlying violation of plaintiffs' constitutional rights. " A claim of inadequate training, supervision, and policies under § 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation by the person supervised." *Webber v. Meford*, 43 F.3d 1340, 1344-45 (10th Cir. 1994); *see also, Wilson*

*v. Meeks*, 98 F.3d 1247, 1255 (10th Cir.1996) ("The district court correctly concluded no municipal liability could be found in this case because there was no constitutional violation committed by any of the individual defendants."). This is so even if the policies, training, and supervision of officers were unconstitutional – without a constitutional violation by the individual officer, there is no municipal liability. *Trigalet v. City of Tulsa, Oklahoma*, 239 F.3d 1150, 1155-56 (10th Cir. 2001) (city not liable for unconstitutional policies regarding high speed chase where innocent motorist was killed during pursuit).

### b.       The training was adequate.

Even so, plaintiff has failed to establish a complete failure to train, or that the training was so grossly negligent that future misconduct was all but inevitable.  Kibbee and Smith have completed the prescribed training at regional academies necessary to qualify as a certified Law Enforcement Officer in the State of Kansas. Since their initial qualification, both officers have completed the Olathe Police Department Field Training Curriculum and have maintained on an annual basis the necessary training hours to maintain their certification as a law enforcement officer. As part of this training, Kibbee and Smith received training on the policies of the Olathe Police Department as it pertains to arrest, search and seizure to include the Policy Directives and Protocol in effect at the time.

Cook has nothing but allegations that the City's training of its officers is deficient.  She cannot articulate her claims and has no evidence to support them.

### c.       There is no evidence of deliberate indifference.

To find deliberate indifference, a plaintiff must show that " 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need.' "*Brown v. Gray*, 227 F.3d 1278, 1288 (10th Cir.2000) (quoting, *City of Canton*, 489 U.S. at

390). Proof of indifference to a citizen's rights can be proven in two ways:  "(1) by showing that the municipality deliberately or consciously chose not to train its officers despite being on notice that its current training regimen had failed to prevent tortious conduct by its officers or (2) showing a single incident with proof of the possibility of recurring situations that presented an obvious potential for violation of constitutional rights and the need for additional or different police training."  *McClendon v. City of Columbia*, 258 F.3d 432 (5th Cir. 2001). The *McClendon* court recognized that proof of a single incident ordinarily is insufficient to establish municipal liability for inadequate training.

Cook cannot identify any other incident similar to those at issue.  Plaintiffs need to show that the training given by the OPD was "inadequate as compared to any recognized or accepted law enforcement standards." *Newell*, 276 F.Supp.2d at 1158. Further, plaintiffs must provide expert testimony proffering that the OPD's training program was inadequate or that it suffered from any "glaring omission" from which "one could reasonably say that the use of excessive force against the plaintiff ... was a highly predictable consequence of the omission."  Id. Plaintiff has not designated an expert to provide testimony in this regard.

Plaintiff has no evidence to support the existence of deliberate indifference, and her claims fail.

### d. Any deficiency did not cause a constitutional violation.

"[I]n order for liability to attach in a failure to train case, 'the identified deficiency in a city's training program must be closely related to the ultimate injury,' so that it 'actually caused' the constitutional violation." *Brown v. Gray*, 227 F.3d 1278, 1290 (10th Cir.2000) (quoting, *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  Again, plaintiff has failed to explain how any failure to train actually caused a constitutional claim, and has produced no evidence to support the notion. Her claims fail.

####    e.   Other claims against the City.

To the extent Cook makes other claims about failures on the part of the City, they are evaluated according to the same standards as a failure to train claim, and they fail. Where municipal liability is asserted based on its failure to act, plaintiff must prove that the inaction was the result of deliberate indifference to the rights of its citizens. *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006). The deliberate indifference standard may be satisfied only "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1999).

Plaintiff has had difficulty articulating her claims against the City. Without the benefit of a final Pretrial Order in this case, it is difficult to respond to each or all of them in a cohesive manner. Suffice it to say that in regard to any additional claims against the City, Cook has failed to demonstrate any of the essential elements of her claims, and they fail.

### V.   CONCLUSION

For the reasons set forth above and in defendants' first Cross Motion for Summary Judgment [Doc.#77], defendants Kibbee, Smith and the City of Olathe are entitled to summary judgment on all remaining claims against them.

Respectfully submitted,

FISHER, PATTERSON, SAYLER & SMITH, LLP

  /s/ Michael K. Seck, #11393
Michael K. Seck, #11393
51 Corporate Woods, Suite 300
9393 West 110th Street
Overland Park, Kansas  66210
(913) 339-6757 / (913) 339-6187 (FAX)
mseck@fisherpatterson.com
ATTORNEYS FOR DEFENDANTS
CITY OF OLATHE, LEE KIBBEE AND WESLEY SMITH

O0288352.WPD;3                                                 - 29 -

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing *Memorandum in Support of Defendants' Motion for Summary Judgment* on this **8th** day of April, 2011, with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Jeremiah Johnson, KS#22726
LAW OFFICES OF JEREMIAH JOHNSON LLC
104 E. Poplar
Olathe, Kansas 66061
(913) 768-0070\Fax: (913) 764-5012
(816) 284-9524
jeremiah@kcatty.com
**ATTORNEY FOR PLAINTIFF**
**SAMANTHA COOK**

Todd A. Scharnhorst, KS#16863
Shannon Cohorst, KS#23496
SCHARNHORST AST & KENNARD, P.C.
1000 Walnut, Suite 1550
Kansas City, MO 64106
(816) 268-9401\Fax: (816) 268-9409
tas@sakfirm.com
sdc@sakfirm.com
**ATTORNEY FOR DEFENDANTS**
**OLATHE HEALTH SYSTEMS, INC.**
**MELISSA DAVENPORT AND KIM WHEELER**

Trevin Wray, KS#21165
HOLBROOK & OSBORN, P.A.
7400 West 110th Street, Suite 600
Overland Park, Kansas 66210-2362
(913) 342-2500\Fax: (913) 342-0603
twray@holbrookosborn.com
**ATTORNEYS FOR DEFENDANT**
**RONALD KARLIN, M.D.**

/s/ Michael K. Seck, #11393