# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SAMANTHA COOK,                          )
                                        )
                    Plaintiff,          )
                                        )          CIVIL ACTION
v.                                      )
                                        )          No. 10-2133-KHV
OLATHE MEDICAL CENTER, INC., et al.,    )
                                        )
                    Defendants.         )
_____)

## MEMORANDUM AND ORDER

Samantha Cook brings suit against Olathe Medical Center, Inc. ("OMC"), Melissa Davenport and Kim Wheeler, nurses at OMC; Ronald Karlin, a doctor at OMC; the City of Olathe; and Lee R. Kibbee and Wesley H. Smith, Olathe police officers. Against the City of Olathe, Kibbee and Smith, plaintiff asserts claims under 42 U.S.C. § 1983 for violation of constitutional rights. See Pretrial Order (Doc. #209) filed April 27, 2011 at 18-22. Against OMC, Davenport, Wheeler and Karlin, plaintiff asserts medical malpractice claims under Kansas law. See id. at 22-24. This matter comes before the Court on the Motion For Summary Judgment Of Defendants, Lee Kibbee, Wesley Smith And City Of Olathe, Kansas (Doc. #196) filed April 8, 2011. For reasons stated below, the Court sustains defendants' motion.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(a); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome

of the suit under the governing law." <u>Liberty Lobby</u>, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Hicks v. City of Watonga, Okla.</u>, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof. <u>See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. <u>Applied Genetics</u>, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment. <u>See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. <u>Liberty Lobby</u>, 477 U.S. at 250-51. In response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Liberty Lobby</u>, 477 U.S. at 251-52.

# Facts

The following facts are either uncontroverted or construed in a light most favorable to plaintiff.[1]

At all times relevant to this action, Lee R. Kibbee and Wesley H. Smith were employed as police officers for the City of Olathe, Kansas.

On April 17, 2008, plaintiff was driving northbound on I-35 when Kibbee stopped her for speeding. When Kibbee activated his lights and siren, plaintiff continued to drive in the center lane and did not immediately pull over.[2]  See Plaintiff's Exhibit A at 2:58:22. After about 28 seconds,

---

[1]    The Court includes only those facts which are relevant to defendants' motion for summary judgment. Also, pursuant to D. Kan. Rule 56.1, the Court considers only those facts which the parties include in their statement of facts, in numbered fact paragraphs with proper record citation and support. See Vasquez v. Ybarra, 150 F. Supp.2d 1157, 1160 (D. Kan. 2001). Pursuant to D. Kan. Rule 56.1, for purposes of summary judgment, the Court deems all such facts admitted unless specifically controverted by the opposing party. See id. The Court does not consider facts which the parties discuss only in the argument section of their briefs and not in a statement of facts pursuant to D. Kan. Rule 56.1, see Jones v. Unified Gov't Of Wyandotte County/Kansas City, Kan., 552 F. Supp.2d 1258, 1261 n.1 (D. Kan. 2008), and the Court does not consider facts which the record citation does not properly support. Finally, the Court declines to consider arguments raised for the first time in a reply brief. See Stump v. Gates, 211 F.3d 527, 533 (10th Cir. 2000); Rubio v. Turner Unified Sch. Dist. No. 202, 523 F. Supp.2d 1242, 1252 (D. Kan. 2007).

[2]    Plaintiff contends that she did not "continue" to drive in the center lane. See Plaintiff's Response (Doc. #211) at 1. In support of her contention, plaintiff cites the video from Kibbee's patrol car, i.e. plaintiff's exhibit A. The video shows that after Kibbee activated his lights and siren, plaintiff continued driving in the center lane for approximately 28 seconds. See Plaintiff's Exhibit A at 2:58:22-50. It does not controvert defendants' assertion that plaintiff continued to drive in the center lane.

At plaintiff's criminal trial, Kibbee testified as follows:

Once I caught up to the vehicle, I had lights and sirens on and the vehicle continued driving in the middle of the lane for a period of time, what I determined was abnormal. I felt it was taking the driver too long to respond to my emergency equipment. Eventually the driver did move over to the right lane and I assumed the driver would keep moving on over to the shoulder. However, [the driver] kind of

(continued...)

plaintiff moved to the right lane. See id. at 2:58:50. In the right lane, plaintiff continued driving for approximately eight seconds. See id. at 2:58:50-58. In the right lane, before pulling onto the shoulder on the right side of the road, plaintiff swerved slightly toward the left lane. See id. at 2:58:53-55.

After plaintiff stopped, Kibbee approached plaintiff's car and asked for her driver's license. Plaintiff had trouble finding her license. Kibbee smelled alcohol and noticed that plaintiff's eyes were bloodshot.[3] Kibbee suspected that plaintiff was driving under the influence of alcohol.[4]

Shortly after Kibbee stopped plaintiff, Smith arrived on the scene to assist.

Kibbee asked plaintiff to exit the vehicle. After asking plaintiff for identification information, Kibbee asked the following questions: "Do you have anything on you that I need to know about? Any drugs or weapons?" Plaintiff's Exhibit A at 3:02:03-07. Plaintiff did not audibly respond. See id. at 3:02:07. Kibbee asked, "Do you mind if I search you?" See id. at 3:02:08-10. Plaintiff agreed. Kibbee proceeded to search plaintiff's person by reaching inside her front jeans

---

[2](...continued)
    swerved back to the left and drove in the right lane. I would say 1 to 2 seconds
    before moving on over to the right shoulder before stopping.

Jury Trial Transcript, Vol. 1 at 63:16-25, Defendants' Exhibit 2.

[3]     Kibbee testified that he also noticed that plaintiff's speech was slurred. See Defendants' Exhibit 2 at 70:6-7. Plaintiff contends that the police video shows that "in no way" was her speech slurred. Plaintiff's Response (Doc. #211) ¶ 8. In the video, plaintiff's speech is not obviously slurred. Construing the evidence in a light most favorable to plaintiff, a fact finder could conclude that plaintiff did not slur her speech. Accordingly, for summary judgment purposes, the Court disregards Kibbee's testimony that plaintiff slurred her speech.

[4]     Defendants contend that Kibbee suspected that plaintiff was driving under the influence of alcohol or drugs. In plaintiff's criminal proceedings, Kibbee so testified. See Defendants' Exhibit 1 at 7:1-3. When he arrested plaintiff, Kibbee stated that it was for driving under the influence of alcohol. See Plaintiff's Exhibit A at 3:13:40-43.

pockets and patting the outside of her clothing.[5]  Plaintiff cooperated with the search.

At Kibbee's request, plaintiff performed field sobriety tests.  While plaintiff was performing the tests, Smith observed a pipe which is commonly used to smoke marijuana on the floorboard of plaintiff's car.  Smith told Kibbee about the pipe.  Kibbee placed plaintiff under arrest for driving under the influence of alcohol ("DUI").

The officers handcuffed plaintiff and placed her in the back seat of a patrol car.  A small plexiglass enclosure separated the back seat from the front seat.

Following the arrest, Kibbee searched plaintiff's car and found the marijuana pipe.

While plaintiff was in the back seat of the patrol car, she began to hyperventilate.  She knocked on the window.  Kibbee and Smith called an ambulance.[6]  Smith got plaintiff out of the car and had her kneel on the side of the road.  When the ambulance arrived, plaintiff asked to be taken to the hospital.  Ambulance personnel strapped plaintiff to a stretcher and placed her in the ambulance.[7]  Plaintiff lay on her side on the stretcher with her hands cuffed behind her back and

---

[5]  The police video shows that the search lasted approximately 60 seconds.  Kibbee asked plaintiff to put her hands behind her back, interlock her fingers and spread her feet apart wide.  See id. at 3:02:16-24.  For about 17 seconds, he searched plaintiff's front right jean pocket with his fingers inside the pocket.  See id. at 3:02:16-26-43.  During that time, he pulled something out, examined it, put it back in the pocket and continued searching the pocket.  For about 13 seconds, Kibbee checked plaintiff's back pockets.  See id. at 3:02:43-56.  For about 10 seconds, he reached his fingers into her front left pocket.  See id. 3:02:58 to 3:03:08.  Next, he briefly swept his hand between plaintiff's breasts, see id. at 3:03:08, and patted his hands down the outside of plaintiff's legs.  See id. at 3:03:09-17.

[6]  The parties dispute whether plaintiff requested an ambulance.  Defendants maintain that she did.  Plaintiff asserts that Kibbee and Smith decided to call an ambulance to have her medically evaluated.

[7]  Plaintiff contends that her hands were cuffed behind her back when ambulance personnel carried her to the ambulance.  See Plaintiff's Response (Doc. #211) ¶ 106.  Although plaintiff's citation to the record does not support the assertion, the police video reveals that at the
(continued...)

straps securing her torso and feet to the bed. At the time, plaintiff was calm. For at least ten minutes, plaintiff remained in the ambulance without incident. At some point, Kibbee and Smith got in the ambulance and rode with plaintiff to the hospital.

In the ambulance, Kibbee and Smith began feeling around plaintiff. Specifically, plaintiff testified that they "were like feeling around, like checking my pockets, and then, like, holding, like squeezing my face and they were just all over me." Plaintiff's Exhibit A at 55:16-18. In response, plaintiff became combative and began screaming, kicking and spitting. To prevent injury to herself, paramedics and themselves, Kibbee and Smith physically restrained plaintiff. The ambulance ride lasted approximately 15 minutes.

When they arrived at the hospital emergency room, plaintiff continued to scream and, at times, kick. Kibbee believed that plaintiff was a threat to herself and all present. Kibbee and/or Smith remained with plaintiff during the entire time she was at the hospital.

At the hospital, Dr. Karlin examined plaintiff. In an attempt to diagnose plaintiff's condition and ensure that she did not need potentially life saving treatment, Dr. Karlin ordered blood and urine samples.[8] At the time, Dr. Karlin did not believe that plaintiff was capable of giving consent. He ordered that she be secured to the bed with hospital restraints.

While OMC staff drew plaintiff's blood, Kibbee held her down.

---

[7](...continued)
time paramedics carried plaintiff to the ambulance, her hands were cuffed behind her back. <u>See</u> Plaintiff's Exhibit A at approximately 3:35:06.

[8]      Dr. Karlin routinely orders diagnostic blood and urine testing for emergency room patients. For plaintiff, Dr. Karlin also ordered a variety of diagnostic tests including glucose testing to check blood sugar levels, BUN and creatine testing to test kidney function, as well as testing to assess her carbon monoxide, potassium, sodium and chloride levels. He also ordered a test on plaintiff's arterial blood gasses, as well as a drug panel, aspirin, acetometaphen and alcohol testing. Plaintiff does not challenge Dr. Karlin's decision to order those tests.

With Kibbee and Smith in the room, hospital staff removed plaintiff's clothes and put a hospital gown on her. During this time, Smith held plaintiff's left arm but turned his head away, trying not to look.

OMC staff used a catheter to obtain urine from plaintiff. Despite hospital restraints, plaintiff was able to move her legs during the procedure. Three nurses (including Davenport and Wheeler) were in the room. They asked Kibbee and Smith to remain in the room. While Davenport inserted the catheter, Kibbee and Smith were on each side of plaintiff, holding her legs. Two nurses were at the head of plaintiff's bed. The nurses asked Kibbee and Smith to be in the room so that Davenport would not get injured if plaintiff decided to act out. Davenport testified that without the officers holding plaintiff down, she could not have taken the urine sample without jeopardizing her safety.

Kibbee asked plaintiff to agree to provide blood and urine samples to law enforcement. Plaintiff did not respond. Kibbee thereafter obtained some of plaintiff's blood and urine from the hospital.[9] Wheeler signed a Kansas Bureau of Investigation form indicating that she had drawn blood and urine samples from plaintiff.

---

[9] During plaintiff's criminal proceedings, Kibbee explained that he obtained the samples as follows:

> I provided Ms. Cook with an Implied Consent Notice, both verbally and in written form. And I asked her to provide a blood and urine sample, and she did not respond to me. And a few minutes after that, one of the nurses came in and told her that they were going to take blood and urine, based on the doctor's orders. Ms. Cook said that she did not want them to do that. And the nurse explained that the doctor ordered it, and they were going to do it. The blood and urine was taken, and the nurse asked Ms. Cook if she could provide some of the blood and urine for testing, and Ms. Cook did not answer. And based on that, the nurses assumed that she was consenting to it and provided it to me.

Suppression Hearing Transcript at 13:5-18, Exhibit 2 to Defendant's Reply (Doc. #114).

The blood test revealed that plaintiff's blood alcohol content was 0.153, nearly double the legal driving limit of 0.08. Plaintiff's urine also tested "presumptive positive" for marijuana.

The Johnson County prosecutor charged plaintiff with refusing a preliminary breath test, possessing drug paraphernalia, DUI, battery and battery on a law enforcement officer. Plaintiff pled guilty to refusing a preliminary breath test. On July 1, 2009, following trial, a jury found plaintiff guilty on the remaining charges. The Johnson County Court has not yet sentenced plaintiff for the offenses.[10]

Kibbee and Smith completed the prescribed training at regional academies to qualify as certified law enforcement officers in the State of Kansas. Since their initial qualification, both officers have completed the Olathe police department field training curriculum and have maintained the necessary training hours to keep their annual certification as law enforcement officers. As part of this training, Kibbee and Smith received training on the policies of the Olathe police department as it pertains to arrest, search and seizure.

Olathe police department Policy Directive 6.15 is entitled "Use of Recording and Tracking Equipment." The policy contains guidelines for the use, management, storage and retrieval of Mobile Video Recording ("MVR") equipment and voice recorders by members of the Olathe police department. MVR equipment, or in-car recorders, vary with the age of the patrol car and can involve VHS, DVD or digital recording technology. Officers are trained on recorders through the Field Training Officer program, one of the first phases of training for new officers. Specifically,

---

[10] Although the summary judgment record does not establish these facts, it appears that the trial and conviction occurred in the summer of 2008. Defendants contend that plaintiff has not been sentenced because shortly after her conviction, she absconded to Florida, was arrested on other felony charges and has been held there since that time. See Defendants' Reply In Support Of Cross-Motion For Summary Judgment (Doc. #114) filed September 27, 2010 at 5 ¶ 41.

officers are trained how to work the recorder and how to store the recordings.  The policy states that *audio* recorders should be used by all uniformed officers during domestic violence investigations, traffic stops, citizen statements during an investigation, interviews with suspects or arrestees, problems at a detention facility, or if the officer expects a need to respond to active aggression or resistance.  Department policy states that *video* recorders should be used during traffic stops.

Regarding audio recording, Policy Directive 6.15 states as follows:

> When the MVR is activated, members shall ensure that the audio portion is also activated upon arrival at the designation event to properly document the situation.  Once the member has begun recording an activity, the MVR shall not be deactivated until the activity is completed.  The first officer on the scene is responsible for activating the wireless microphone for the MVR.  All other officers arriving on scene will keep the MVR(s) activated, however, if applicable, they will activate their micro cassette recorder or digital recorder so as to minimize interference with the original transmission signal.  The wireless microphone and/or other recorders (micro cassette, digital) will be kept activated during the entire event.

Policy Directive 6.15 ¶ III(G), Defendant's Exhibit 17.

Regarding activation or deactivation of wireless microphone, micro cassette or digital recorders, Policy Directive 6.15 provides the following exceptions:

1.  During direct officer to officer consultations held away from contact with any member of the public during the event (wireless, micro cassette, digital).
2.  As a matter of a proper investigative technique where it is prudent to switch to the panel audio recorder in the vehicle (wireless).
3.  When the physical activation of such equipment would interfere with proper officer safety techniques.  However, every officer should project their enforcement/contact action in a manner that would allow them the opportunity to activate the equipment (wireless, micro cassette, digital).
4.  Upon arrival at a detention facility once an arrestee has been secured, the MVR may be deactivated.
5.  Staff Officers are exempt as their duty uniform changes on a day to day basis and they may not be readily equipped with a recording device.

Id.

Department policy does not state that officers must activate audio or video recorders while

asking someone to take a breath test or reading an implied consent advisory.

Policy Directive 6.15 requires officers to create logs to note information about incidents recorded, storage of logs, storage of tapes and other media, and anti-erasure protections. Regarding recorded media, Policy Directive 6.15 requires officers to either place it into evidence or place it in storage to be held for 90 days before being destroyed. An officer may use the check out/hold log procedure to remove recorded media from the 90-day schedule for use in a court case or for training or other purposes. No recorded media may be erased without prior approval of the Division Commander.

Regarding transporting a person in custody to a medical facility, Policy Directive 2.2 states in part as follows:

> If a person receiving medical attention is transported to a medical facility, an officer shall accompany the person and should remain with the person until such time as the person is released from police custody or is released to another agency.

Defendant's Exhibit 18 ¶ 5. Officers must use their judgment while a person is in custody and receiving medical attention to make certain that the person is not a flight risk and does not pose a safety threat to himself, medical personnel or another officer.

Although no written policy was in effect at the time of plaintiff's arrest, the Olathe police department officer handbook contained protocol on blood draws from DUI suspects.[11]

Policy Directive 2.1, in effect at the time of plaintiff's arrest, addresses when an officer may conduct an arrest, search and seizure.[12]

---

[11]      The record does not disclose the contents of the handbook.

[12]      The record does not disclose the contents of Policy Directive 2.1.

**Analysis**

Against Kibbee and Smith, plaintiff asserts that in violation of the Fourth Amendment, (1) Kibbee and Smith used excessive force in the ambulance and (2) Kibbee performed an impermissible "pat down" search.  See Pretrial Order (Doc. #209) filed April 27, 2011 at 18. Defendants seek summary judgment on the second claim, i.e. that Kibbee performed an impermissible search in violation of the Fourth Amendment.[13]

Against the City of Olathe, plaintiff asserts that in violation of the Fourth Amendment, the City of Olathe (1) failed to train Kibbee and Smith; (2) was deliberately indifferent to constitutional violations by Kibbee and Smith; and (3) created or maintained unconstitutional policies or customs. See Pretrial Order (Doc. #209) at 19-22. The City of Olathe seeks summary judgment on all claims.[14]

---

[13]     Defendants also seek summary judgment on claims that Kibbee and Smith violated plaintiff's constitutional rights by (1) not preserving and/or producing exculpatory evidence; and (2) collecting blood and urine samples.  In the pretrial order, plaintiff does not assert such claims. See Doc. #209. The pretrial order is the controlling document for trial; claims not included in that document are waived even if they appeared in the complaint.  See Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002); see also Lappin v. Gwartney, No. 99-2292-KHV, 2000 WL 1532765, at *3 (D. Kan. Sept. 18, 2000).  To the extent defendants seek summary judgment on these claims, their motion is moot in light of the fact that plaintiff did not include such claims in the pretrial order.

    On March 1, 2011, the Court overruled the motion of Kibbee and Smith for qualified immunity on plaintiff's claim of excessive force in the ambulance.  See Memorandum And Order (Doc. #185) at 22-24. Defendants' motion for summary judgment does not address that claim.

[14]     Plaintiff urges the Court to delay ruling on defendants' motion for summary judgment until she has had a chance to depose Kibbee and Smith.  See Plaintiff's Response (Doc. #211) at 14-17.  Pursuant to Rule 56(d), if a nonmovant shows by affidavit or declaration that for specified reasons, she cannot present facts essential to justify its opposition, the Court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order. Fed. R. Civ. P. 56(d).

    Plaintiff presents an affidavit by counsel which states that she needs to depose Kibbee and Smith to obtain information regarding her claims against OMC, Wheeler and Davenport.  See (continued...)

## I.    Plaintiff's Claim That Kibbee Performed Unconstitutional Search

Plaintiff asserts that Kibbee performed an unconstitutional search of her person.  See Pretrial Order (Doc. #209) at 18.  Subject to limited exceptions, the Fourth Amendment requires that before conducting a search, a law enforcement officer must obtain a warrant based on probable cause.  See, e.g., New York v. Belton, 453 U.S. 454, 457 (1981), holding narrowed on other grounds by Arizona v. Gant, — U.S. —, 129 S. Ct. 1710, 1723 (2009).  Here, Kibbee did not have a warrant to search plaintiff.  Thus, the search is unconstitutional unless an exception applies.

Defendants assert that a warrant was not necessary because plaintiff consented to the search. A warrant and probable cause is not necessary if officers conduct a search pursuant to voluntary consent.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Whether a person has voluntarily consented to a search is a question of fact to be determined in view of the totality of circumstances.  See id. at 226.  Here, plaintiff admits that she consented to a search for weapons and drugs but she asserts that the search which Kibbee performed exceeded the scope of her consent.[15]

---

[14](...continued)
Plaintiff's Exhibit I.   The affidavit is silent as to the claims at issue in defendants' motion for summary judgment, i.e. the claim against Kibbee for unconstitutional search and claims against the City for failure to train, deliberate indifference and creating and maintaining unconstitutional policies or customs.  On this record, the Court sees no reason to delay ruling on this motion for summary judgment.

[15]      In response to defendants' motion for summary judgment, plaintiff attempts to controvert defendants' assertion that she consented to Kibbee's request to search for drugs and weapons.  See Plaintiff's Response (Doc. #211) ¶ 12.  Specifically, plaintiff asserts that she consented only to a pat-down search for weapons. Her record citations do not support her assertion. See id.  In the argument section of her brief, plaintiff states that she consented to Kibbee's request to search for weapons and drugs.  See Plaintiff's Response (Doc. #211) at 17.

        The police video establishes that plaintiff consented to a search for weapons and drugs.  Kibbee asked plaintiff whether she had any weapons or drugs and whether he could search
(continued...)

See Plaintiff's Response (Doc. 211) at 17. The standard for measuring the scope of consent under the Fourth Amendment is that of objective reasonableness, i.e. what would a typical reasonable person have understood by the exchange between the officer and the suspect. See Florida v. Jimeno, 500 U.S. 248, 251 (1991). Thus, whether a search exceeds the scope of consent is a question of fact which turns on what a reasonable person would have understood to be the scope of consent under the circumstances. See United States v. Rosborough, 366 F.3d 1145, 1150 (10th Cir. 2004). Scope is generally defined by its expressed object, and is limited by the breadth of the consent given. See United States v. Elliott, 107 F.3d 810, 814-15 (10th Cir. 1997). Failure to object to a search is an indication that the search is within the scope of consent. See United States v. Pena, 143 F.3d 1363, 1368 (10th Cir. 1998).

To prove that the search was unconstitutional, plaintiff must show that she did not consent to the search. Plaintiff asserts that she consented to a pat down search for weapons, but not the invasive search which Kibbee performed.[16] See Plaintiff's Response (Doc. #211) ¶ 12. Specifically, plaintiff states that she consented to a search for weapons and drugs, and "Kibbee proceeded to put his hands into [her] pockets, on or in between her breasts, and on her buttocks." Id. Plaintiff provides no evidence that she limited her consent in any way. See, e.g., United States v. Blackburn, 64 Fed. Appx. 190, 196 (10th Cir. May 29, 2003). The police video shows that Kibbee asked whether she

---

[15](...continued)
her. See Plaintiff's Exhibit A at 3:02:03-07. Plaintiff agreed. See id. (although plaintiff's response is not visible or audible in police video, she does not contest that she responded affirmatively).

[16]    To the extent plaintiff asserts that the search exceeded the scope of a permissible pat down search under Terry v. Ohio, 392 U.S. 1 (1968), her argument misses the mark. Defendants assert that the search was valid based on consent. They do not contend that Kibbee performed a non-consensual protective search for weapons which might be used to harm himself or others nearby. See id. at 26.

had any drugs or weapons, and requested permission to search. Plaintiff consented to the request. See Plaintiff's Response (Doc. #211) at 17. Thereafter, Kibbee spent approximately one minute searching plaintiff's jean pockets and frisking the outside of her body. A reasonable person would understand that a search for drugs would include a search of one's pockets and a brief pat-down of one's body. See, e.g., Jimeno, 500 U.S. at 251 (scope of consent to search generally defined by its expressed object); see also United States v. Ramstad, 308 F.3d 1139, 1147 (10th Cir. 2002) (in vehicle search, motorist's consent to search for drugs implies that officer could look wherever drugs might be hidden). Plaintiff cooperated with the search and did not protest in any way. See United States v. Gonzalez-Basulto, 898 F.2d 1011, 1013 (5th Cir. 1990) (defendant's failure to protest at any time evidence that search did not exceed consent); United States v. Price, 54 F.3d 342, 346 (7th Cir. 1995) (where response to request to search ambiguous, failure to object showed consent to pat-down search); United States v. Ponce, 8 F.3d 989, 998 (5th Cir. 1993) (officer did not exceed scope of consent to search for weapons where defendant did not protest removal of contents of watch pocket); cf. United States v. Sanders, 424 F.3d 768, 774-75 (8th Cir. 2005) (refusal to cooperate with search of pockets constitutes withdrawal of consent to search). On this record, the undisputed facts show that plaintiff consented for Kibbee to search her for drugs and weapons.[17] Plaintiff has not shown a genuine issue of fact as to whether Kibbee's search exceeded the scope of her consent. Defendants are entitled to summary judgment on the claim that Kibbee performed an unconstitutional search of plaintiff.

---

[17]     In light of the ruling, the Court does not address defendants' assertion that a warrant was not necessary because the search was incident to plaintiff's arrest.

## II.      Plaintiff's Claims Against The City Of Olathe

Plaintiff asserts that under Section 1983, the City of Olathe is liable for (1) failure to train and/or supervise Kibbee and Smith; (2) deliberate indifference to constitutional violations by Kibbee and Smith; and (3) creating and maintaining unconstitutional policies or customs. See Pretrial Order (Doc. #209) at 19-22. Defendants seek summary judgment on all claims against the City.

A municipality may be liable under Section 1983 if it "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation.[18] See Monell v. Dept. of Social Servs. of NYC, 436 U.S. 658, 692 (1978). Under Section 1983, local governments are responsible only for "their own illegal acts." Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986) (citing Monell, 436 U.S. at 665–683). They are not vicariously liable under Section 1983 for acts by employees. See id. To impose liability on the City under Section 1983, plaintiff must prove that "action pursuant to official municipal policy" caused her injury. Monell, 436 U.S. at 691. Official municipal policy includes decisions of the City's lawmakers, acts of its policymaking officials and practices so persistent and widespread as to practically have the force of law. See id.

### A.      Failure To Train And/Or Supervise

Plaintiff claims that the City is liable under Section 1983 for not training Kibbee and Smith

---

[18]      Section 1983 provides in part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. * * *

42 U.S.C. § 1983.

regarding (1) excessive force and taking non-consensual blood and urine samples; (2) participating in non-consensual taking of blood; (3) participating in non-consensual taking of urine; (4) viewing plaintiff in various states of undress; (5) consent with regard to blood and urine tests and Terry searches; and (6) failure to preserve and produce exculpatory or potentially exculpatory audio and video evidence. See Pretrial Order (Doc. #209) at 19.

In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of Section 1983. See Connick v. Thompson, — U.S. —, 131 S. Ct. 1350, 1359 (2011). To satisfy the statute, a municipality's failure to train must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989)). Deliberate indifference is a stringent standard of fault, i.e. it requires proof that a municipal actor disregarded a known or obvious consequence of his or her action. See Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 410 (1997). Thus, when policymakers are on actual or constructive notice that a particular omission in the training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. Id. at 407.

Defendants assert that plaintiff cannot show that the City's training was inadequate, or that the City was deliberately indifferent with regard to training. See Defendants' Memorandum (Doc. #197) at 27-28. Plaintiff does not respond to the assertion. See Plaintiff's Response (Doc. #211) at 17-25. On this record, plaintiff has not demonstrated a genuine issue of fact as to whether the City failed to train Kibbee and Smith with deliberate indifference to the constitutional rights of others. Defendants are entitled to summary judgment on these claims.

**B.**     **Deliberate Indifference To Constitutional Violations By Kibbee And Smith**

Plaintiff claims that the City is liable under Section 1983 because it was deliberately indifferent to constitutional violations committed by Kibbee and Smith.  Specifically, plaintiff claims that the City (1) ignored previous constitutional violations by Kibbee; (2) did not follow up on investigative recommendations to retrain Kibbee; (3) did not institute department policies regarding the presence of police officers in ambulances; (4) did not institute department policies regarding the presence of police officers in hospital rooms; (5) did not institute department policies regarding the presence of police officers when female detainees are partially clothed; (6) did not institute department policies regarding participation in hospital procedures; (7) did not institute department policies regarding preservation of exculpatory and potentially exculpatory audio and video recordings; (8) did not institute department policies regarding production of exculpatory and potentially exculpatory audio and video evidence; and (9) did not instruct officers about hospital patients' right to refuse treatment.  See Pretrial Order (Doc. #209) at 19-21.

To hold the City liable for inaction under Section 1983, the inaction must amount to deliberate indifference, i.e. tacit approval of an offensive act.  See Houston v. Reich, 932 F.2d 883, 888 (10th Cir. 1991); Specht v. Jensen, 863 F.2d 700, 702 (10th Cir. 1988).  Defendants assert that plaintiff cannot prove her claims of deliberate indifference.  See Defendants' Memorandum (Doc. #197) at 29.  Plaintiff does not respond to the assertion.  See Plaintiff's Response (Doc. #211) at 17-25.  On this record, plaintiff has not demonstrated a genuine issue of fact as to whether the City acted with deliberate indifference to the constitutional rights of others.  Defendants are entitled to summary judgment on these claims.

### C.     Creating And Maintaining Unconstitutional Policies Or Customs

Plaintiff claims that the City is liable under Section 1983 because it created or maintained unconstitutional policies or customs by (1) allowing individual police officers to determine which audio and video recordings to preserve and produce in criminal cases; (2) permitting police officers to be present in hospital rooms when patients did not consent to their presence and when opposite sex detainees were partially clothed; (3) permitting police officers to participate in medical procedures; and (4) not instituting and enforcing policies regarding preservation of exculpatory and potentially exculpatory audio and video evidence.  See Pretrial Order (Doc. #209) at 21-22.

Defendants assert that plaintiff cannot show that a City custom, practice or policy caused a constitutional injury.  See Defendant's Memorandum (Doc. #197) at 23-24.  Plaintiff does not respond to the assertion.  See Plaintiff's Response (Doc. #211) at 17-25.  On this record, plaintiff has not demonstrated a genuine issue of fact as to whether a City custom, practice or policy caused her alleged constitutional injury.  Defendants are entitled to summary judgment on these claims.

**IT IS THEREFORE ORDERED** that the Motion For Summary Judgment Of Defendants, Lee Kibbee, Wesley Smith And City Of Olathe, Kansas (Doc. #196) filed April 8, 2011 be and hereby is **SUSTAINED.**  Regarding plaintiff's claims the against Lee R. Kibbee and Wesley H. Smith, the Court grants summary judgment in favor of defendants on the claim that Kibbee performed an impermissible pat down search in violation of the Fourth Amendment.  The claim that Kibbee and Smith used excessive force in the ambulance remains in the case.

Regarding plaintiff's claims against the City of Olathe, the Court grants summary judgment in favor of the City on all claims.  Specifically, the Court finds that the City of Olathe is entitled to summary judgment on plaintiff's claims that (1) it violated her constitutional rights by failing to train

Kibbee and Smith; (2) it was deliberately indifferent to constitutional violations by Kibbee and Smith; and (3) it created or maintained unconstitutional policies or customs.

Dated this 11th day of July, 2011 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge